Filed 7/27/26  Marriage of Pham and Kazdagli CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of QUYNH PHAM and MIKHAIL KAZDAGLI. | H053271 (Santa Clara County Super. Ct. No. 20FL003970) |
| QUYNH PHAM, Appellant, v. MIKHAIL KAZDAGLI, Respondent. | |

Quynh Pham and Mikhail Kazdagli were married for just under two years.  After dissolution of the parties' marital status, the trial court adjudicated their financial disputes.  Among other provisions, the resulting judgment required Pham to pay Kazdagli over $340,000 and terminated jurisdiction to order spousal support.  Appealing from the judgment and the denial of her new trial motion, Pham contests the fairness of the bench trial and the validity of the substantive rulings.  We will affirm.

## I.    BACKGROUND

The parties married on July 21, 2018, and separated on July 3, 2020.  Pham petitioned for dissolution of marriage in December 2020.  In April 2023, the trial court entered a status-only judgment dissolving the parties' marriage.

In three court days spanning three months of 2024, the court held a bench trial addressing reserved financial issues. These included (1) Kazdagli's claim that Pham breached her fiduciary duty by transferring money from a shared investment account to accounts she managed without his access or input, as well as the disposition of various smaller accounts and a vehicle; (2) Kazdagli's claim for attorney fees and costs under Family Code sections 1101 and 271;[1] (3) Pham's claim that Kazdagli took her personal property; and (4) Pham's claim for spousal support.

## A. Trial Evidence[2]

### 1. Pham's Testimony

During the marriage, Pham and Kazdagli lived an "upper middle class" lifestyle. They rented a "$4,000 apartment" in San Jose and took occasional weekend trips, such as skiing in Breckenridge and wine tasting in Napa.

Although trained as a software engineer, Pham had not worked in the field for roughly 10 to 20 years. Instead, Pham ran a travel startup that had been unprofitable for the last 5 or 6 years. Pham did not believe she had marketable skills.

By the end of trial, Pham was 42 years old, living with her mother, and "drowning" in debt. Pham's mother did not want to continue supporting Pham, having already lent Pham "a lot of money." Pham was taking Zoloft for anxiety and managing a painful fibroid and diverticulitis.

In contrast, Kazdagli had a doctorate in "machine learning" and at the time of separation had been "offered a job for Amazon including stock for about $380,000"— Kazdagli's salary at the time of trial was $250,000 per year.

---

[1] Undesignated statutory references are to the Family Code.

[2] Neither the reporter's transcripts from the three days of trial nor the trial exhibits were designated for inclusion in the appellate record. As a record of the oral proceedings at trial, we have only incomplete excerpts of reporter's transcripts that Pham attached to a posttrial filing. Our summary of the evidence at trial is accordingly incomplete.

Pham attributed her financial straits largely to investment losses.

Pham had opened an investment account (Fidelity 4019) with $200,000 six years before marriage. In December 2019, the parties transferred $50,000 in community funds into Fidelity 4019. At the time, Kazdagli's $25,000 represented 3.7 percent of the account's value.[3] Pham invested heavily in a vaccine stock and used margin loans to increase her exposure, driving gains that increased the value of the investments to $1.2 million at the time of separation. In conjunction with her then-successful investments, Pham owed more than $400,000 in federal income tax.

During the marriage, Pham added Kazdagli's name to Fidelity 4019. Pham did this to support Kazdagli's green card application: She wanted to show that she had the means to support him and that they shared communal accounts as a bona fide married couple.

Pham emptied Fidelity 4019 in June and July 2020, removing about $1.2 million to other investment accounts that were not shared with Kazdagli.[4] Pham considered Fidelity 4019 to be her separate property, other than Kazdagli's $25,000 deposit. Pham did not understand that any automatic temporary restraining order (ATRO) prevented her from doing as she pleased with the funds: Her first lawyer stopped communicating with her when he developed brain cancer. Pham transferred the funds to pursue a more aggressive investing strategy. She also acknowledged having withdrawn $14,500— to repay her mother for a wedding loan—from an account that received some of the transferred Fidelity 4019 funds. But she maintained that her transfers did not otherwise deplete the total investment; they merely shifted the accounts where her money was invested or added to the total investment.

---

[3] This implies that the account's value was about $675,000.

[4] Pham's mother testified that she and Pham were the accountholders on the receiving accounts.

The eventual failure of Pham's investments, however, left only about $2,000 or $3,000.

Pham did not pay her income tax bill and was pursued by credit card companies seeking to collect on her consumer debts.

Kazdagli violated the ATRO's by using community property after the separation and making transfers for his personal use. Kazdagli kept Pham's $114,000 share of community property and never accounted for this.

### 2. *Kazdagli's Testimony*

At Pham's suggestion in May 2019, Kazdagli added her name to two of his Chase accounts (Chase 1158 and Chase 8175), and she added his name to Fidelity 4019. Their purpose in adding Kazdagli to Fidelity 4019 was to pursue a joint investment strategy, not to bolster the green card application he had submitted several months earlier. Kazdagli had about $50,000 in premarital savings, and Pham at some point transferred $50,000 from the Chase accounts to Fidelity 4019. Pham then invested the money in Tesla stock, by the parties' agreement. She later invested in Novavax. Pham also made other smaller investments, but Kazdagli paid little attention to these because he trusted Pham's judgment.

In April 2020, Pham notified Kazdagli by e-mail that she intended to move out the next month and falsely accused him of verbal abuse. Kazdagli tried to work through their issues, but Pham moved out on July 3 after Kazdagli refused to support "her failing startup." Kazdagli sought to reconcile with Pham after she moved out, but she rebuffed his efforts in "extremely aggressive, extremely rude" e-mails in which she "continued to blame" him for the separation.

Without Kazdagli's knowledge or consent, Pham transferred about $1.2 million in stock out of Fidelity 4019 in June and July 2020. When Kazdagli learned about the transfers in August, he asked Pham to return his initial investment and proposed to "sort out the rest" later. Pham did not comply.

4

In fall 2020, Pham attempted to coerce Kazdagli into accepting an unfair marital settlement agreement by threatening to report Kazdagli to immigration and to accuse him of abuse, manipulation, dishonesty, forcing her to marry him, and forcing her to have an abortion. Kazdagli characterized these accusations as false.

Kazdagli refused to settle, and Pham filed for divorce in December 2020. Kazdagli understood that Pham's initiation of divorce proceedings gave rise to an ATRO that prohibited the transfer of assets and required liquidation of securities. But Pham continued actively trading after filing for divorce. Pham "engaged in very risky trading behavior" and borrowed on margin to increase her investment holdings. During the dissolution process, Pham also sold a community-owned house in Florida, claiming to be a single, unmarried, woman. Pham received $238,000 from the sale, which she added to her investment portfolio.

Kazdagli complied with his statutory obligation to disclose his financial condition, but Pham served him with an untimely and incomplete disclosure that omitted investment accounts holding millions of dollars, her wages, and her earnings in 2020 and 2021.[5] Kazdagli later ascertained that Pham earned over $1 million in 2020 and almost $200,000 in 2021.

In 2022, Kazdagli secured an order freezing Pham's investment accounts and requiring an accounting. Pham did not comply, insisting that the investment accounts were her separate funds. By the end of 2022, Pham lost all the assets through risky trading practices.

Kazdagli discussed the parties' Tesla Model 3 purchased during the marriage and numerous smaller financial accounts.

---

[5] During Kazdagli's testimony, Pham stated that her first attorney had prepared the disclosures and that "a lot of these [she] did not look over" but "just signed."

5

During the marriage, Pham and Kazdagli lived in "a regular apartment in San Jose" and "barely took any trips," other than regular ski trips and "one international trip" that "was very cheap." By the end of trial, Kazdagli, a 37-year-old with a doctorate in computer science, was earning $250,000 per year. At some point, Kazdagli was diagnosed with moderate to severe depression, which caused him to miss six months of work.

From June 2023 to March 2024 Kazdagli tried several times to settle the case, but Pham was aggressive and uncooperative. Kazdagli's last offer at the parties' mandatory settlement conference was "a walkaway deal" by which neither party would owe the other anything: Kazdagli would abandon his claim that Pham breached her fiduciary duties. Kazdagli incurred about $108,000 in attorney fees and about $30,000 in expert fees over the course of the case.

### 3. *Forensic Accounting*

#### a. *Thomas Dowling*

Thomas Dowling, a certified public accountant specializing in tracing of separate and community property, testified on Kazdagli's behalf about his analysis of the parties' accounts. Dowling assumed (for purposes of his testimony and one of the reports he prepared) that no separate property was transmuted into community property. Dowling also testified that he used generally accepted tracing protocols: For transfers from jointly titled accounts to a party's separately titled account, he assumed that the funds transferred came first from the receiving party's separate property, if any; but for transfers between accounts that were either both jointly titled or both separately titled, he assumed that the funds transferred community and separate property in the same proportion as the source account.

When the parties were married, Fidelity 4019 was Pham's separate property, and Chase 1158 and Chase 8175 were Kazdagli's separate property. Kazdagli's paychecks

6

during marriage—presumptively community property—were deposited in the Chase accounts.

In December 2019, $50,000 was transferred from Chase 1158 to Fidelity 4019. Of that amount, $42,401 was community property and $7,599 was Kazdagli's separate property.[6] Another $10,000 was deposited from a third Chase account, this one titled in Pham's and her mother's name; Dowling characterized this deposit as community property, because the source Chase account had received at least four transfers totaling about $13,000 in community deposits during the marriage.[7]

Kazdagli's interest in the Fidelity 4019 investments grew from $212,014 as of June 30, 2020, to $329,409 (of about $2.7 or $2.8 million in total investment value) as of July 30, to over $500,000 (of about $4.4 million). But by the end of 2022, the total investment value had dropped to $8,000 due to Pham's risky investment strategy—taking margin loans to increase her exposure—and the eventual failure of her investments.

Dowling calculated that nearly $500,000 had been withdrawn from the investment accounts. Dowling did not determine whether Pham profited from those withdrawals and merely concluded that "there was cash available at one time."

Besides Fidelity 4019, Dowling traced the funds in Kazdagli's 401(k) accounts, to which community funds were added during the marriage. Dowling did not, however, do a comprehensive tracing of all the parties' respective financial accounts. Dowling's role was limited to tracing separate property, not the removal of funds from accounts that contained only community property.

---

[6] Dowling acknowledged two other transfers out of Chase 1158 and Chase 8175, totaling over $40,000, and confirmed that he viewed those as transfers of community property.

[7] Dowling did not otherwise trace this third Chase account.

### b. *Vivian Chien*

Pham called Vivian Chien to rebut Dowling's opinions.[8] (See Code Civ. Proc., § 2034.310.) Chien disputed the methodology Dowling used to calculate Kazdagli's share of the assets Pham transferred from Fidelity 4019. Chien testified that it was improper for Dowling to consider transfers out of Pham's investment accounts as cashouts while ignoring the transfers into those accounts, because any withdrawals were to reimburse deposits.[9] Further, Chien opined that in calculating Kazdagli's share of the investment account Dowling improperly used the net account balance rather than the market value of the holdings and used an incorrect basis to calculate appreciation. Chien also disagreed with Dowling's characterization of funds involved in a handful of transfers.

### B. *Decision, New Trial Motion, Judgment, and Appeal*

In September 2024, the trial court ruled that Pham breached her fiduciary duty by transferring more than $1.2 million out of Fidelity 4019 in June and July 2020. The court awarded Kazdagli $329,409, the value of Kazdagli's share of the investments as of July 31, 2020, assuming that the addition of Kazdagli's name to the account had not transmuted Pham's separate property. The court awarded Kazdagli $21,000 in expert costs and $25,000 in attorney fees as a remedy for the breach of fiduciary duty (§ 1101) and as a sanction for frustrating the policy of promoting settlement and encouraging cooperation (§ 271). The court reduced this award by $34,467.21, representing Pham's community interest in nine accounts and a vehicle at the time of separation. The court confirmed various other financial accounts as either Pham's or Kazdagli's separate

---

[8] The court barred Pham from eliciting direct testimony from Chien. (See Code Civ. Proc., § 2034.300.)

[9] Dowling responded that he did not view the outgoing transfers as cashouts, but as occasions when Kazdagli was denied the opportunity to receive his share before the funds were reinvested.

8

property. The court denied Pham's claim for reimbursement for property Kazdagli allegedly retained after separation, reasoning that Pham had failed to collect the property when given the opportunity. The court terminated jurisdiction to award spousal support as to both parties. The net monetary award in Kazdagli's favor was $340,941.79. The court directed Kazdagli to prepare the judgment on these rulings.

Before entry of judgment, Pham moved for a new trial. After a continuance, the trial court denied the motion on procedural grounds—including that the extent of the continuance divested the trial court of jurisdiction to grant the motion—and entered judgment.

Pham timely appealed from the judgment and the denial of her new trial motion.

## II. DISCUSSION

On appeal, the trial court's order is presumed to be correct, and it is Pham's burden as the appellant to overcome that presumption. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 (*Jameson*).) So Pham " 'has the burden of providing an adequate record. [Citation.] Failure to provide an adequate record on an issue requires that the issue be resolved against' " her. (See *id*. at p. 609; see also *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295–1296.) An adequate record includes " ' "portions of the proceedings … which may provide grounds upon which the decision of the trial court could be affirmed." ' " (*Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 644.) These principles apply with equal force to parties representing themselves. (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984–985; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 (*Falcone & Fyke*).) Pham, a self-represented litigant, " 'is entitled to the same, but no greater, consideration [as] other litigants and attorneys.' " (*Tanguilig v. Valdez* (2019) 36 Cal.App.5th 514, 520; see also *Rappleyea*, at pp. 984–985.)

Pham contends that the trial court erred by (1) ignoring her request for attorney fees under section 2030, depriving her of counsel at trial; (2) denying her a fair

9

opportunity to present her case at trial; (3) excluding direct testimony from her expert witness; (4) ruling in Kazdagli's favor on his breach of fiduciary duty claim and request for attorney fees and expert costs; (5) ruling against her in connection with certain of her claims; and (6) denying her motion for a new trial.  Relatedly, Pham contends that the court was biased against her.  On the record presented, we will reject Pham's claims of prejudicial error.

## A.     *Pham's Section 2030 Request for Attorney Fees*

"In a proceeding for dissolution of marriage …, and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party … to pay to the other party … whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding."  (§ 2030, subd. (a)(1).)

"When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties.  If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs.  A party who lacks the financial ability to hire an attorney may request, as an in pro per litigant, that the court order the other party, if that other party has the financial ability, to pay a reasonable amount to allow the unrepresented party to retain an attorney in a timely manner before proceedings in the matter go forward."  (§ 2030, subd. (a)(2).)  "Attorney's fees and costs within [section 2030] may be awarded for legal services rendered or costs incurred before or after the commencement of the proceeding."  (§ 2030, subd. (b).)

10

A party to a marriage dissolution proceeding may make a written request for pendente lite attorney fees by a noticed motion or an order to show cause. (*In re Marriage of Knox* (2022) 83 Cal.App.5th 15, 30 (*Knox*); see also *In re Marriage of Hoch* (2026) 119 Cal.App.5th 80, 100 ["the obligation to ensure access to legal representation is triggered by a request for attorney's fees"].) Once such a request is made, the court must resolve the request during the proceeding and without unreasonable delay. (*Knox*, at pp. 30–31.) This is because " '[t]he purpose of section 2030 is to ensure parity. "The idea is that both sides should have the opportunity to retain counsel, not just … the party with greater financial strength." ' " (*Knox*, at p. 31.) When a court rules on a motion under section 2030, it "must make explicit findings on the issues listed in section 2030, subdivision (a)(2)." (*In re Marriage of Hearn* (2023) 94 Cal.App.5th 380, 393.) These rules limit a court's discretion in resolving section 2030 fee motions. (See *Knox*, at pp. 24–25.) Where a trial court commits a procedural error in resolving a section 2030 fee motion, we consider whether such error was prejudicial. (See *Knox*, at p. 39; *In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1051.)

Pham contends that she requested attorney fees under section 2030 and that the trial court erred by ignoring the request. Although we conclude that the court unreasonably delayed ruling on Pham's motion and should not have faulted her for the clerk of court's choice of hearing date, Pham has not shown prejudicial error on this incomplete record.

### 1.     *Additional Background*

Per the register of actions, Pham filed a notice of substitution of counsel on January 24, 2024. Pham then filed a request for attorney fees and an income and expense declaration on February 22. Finally, on April 2, Pham filed a request for order

11

concerning the trial date. But these filings are not among the documents Pham designated for inclusion in the clerk's transcript.[10]

The appellate record does, however, include the trial brief Pham filed on April 5—the Friday before a trial set for April 8. In the brief, Pham invoked section 2030 in support of a request to order Kazdagli to pay her attorney fees and costs. And a transcript of the trial's first day includes discussion of the substitution and Pham's requests for continuance of the trial and for attorney fees.[11]

The trial court denied Pham the requested continuance because she failed to make the request by a properly noticed motion or ex parte application. The court added that even if Pham had properly made the request, it would have denied the motion because Pham's lack of representation—the apparent basis for the motion—was "a decision [Pham] made after the trial date was set."[12]

Pham attempted to broach her request for attorney fees that afternoon. Telling the court that she had filed a motion to "have [Kazdagli] pay for [her attorney] because [she

---

[10] Pham attached a copy of the income and expense declaration to her trial brief. According to the declaration, Pham was working for her own company but earning a negative income. Pham had about $11,000 cash, stocks, bonds, and other liquifiable assets, but had a net of about negative $325,000 in other property. Her mother and stepfather assisted with monthly expenses.

[11] Pham did not designate as a record of the oral proceedings the reporter's transcript of the first day of trial, but she attached the transcript as an exhibit to another filing that she did designate for inclusion in the clerk's transcript. (Compare Cal. Rules of Court, rule 8.121(b)(1)(C) [election to proceed with or without a record of oral proceedings] with 8.121(b)(1)(B) [designation of contents of clerk's transcript].) The court did not address the motions before beginning trial, Pham having reported that she was "not sure" if there were any other orders the court needed to make at the outset of trial.

[12] The trial court learned of the continuance motion the night before trial. It did not review the attorney fees motion, which was set for hearing two weeks after the trial date, until a recess in the first day of trial. The court discussed both motions with the parties at the end of the trial's first day.

could not] afford [it]," Pham explained that she was "completely clueless on this whole process," "completely broke," and "in debt for a long time." The court later announced that it would not hear Pham's fee motion on the noticed date of April 22 but would delay the hearing by more than three weeks to the second day of trial, May 14. The court warned Pham that she would have to explain then how it could lawfully award her attorney fees—"especially without [her] having a lawyer." When Pham asked for clarification about the hearing date, the court explained that it was continuing the motion because it "would be super unfair if I calendared a motion in the middle of trial to give you money to … fund an attorney." Pham noted that the April 22 hearing date was the date she had been given and that her previous lawyer had stopped representing Pham, and Pham had signed a substitution, because Pham could not pay. The court replied that Pham should have applied ex parte for a hearing date before the start of trial, observing that "[n]obody put a gun to [her] head and said sign this substitution of attorney."

Consistent with Pham's designation of the record, the clerk's minutes, entered the next day, are not in the appellate record. Nor does the record disclose if, when, or how the court decided Pham's motion for attorney fees.[13] But Pham has remained unrepresented by counsel for the remainder of the proceedings leading up to, and including, this appeal. And the register of actions establishes that there were no hearings between April 8 and May 14, the first two days of trial, so Pham's fee request was not heard on the April 22 date she originally noticed.

---

[13] The register of actions refers to the fee motion in connection with the second day of trial, May 14, 2024. Nothing in the copy of the transcript from that day addresses the motion. The transcript includes a notation that some discussions were held off the record, there is no record of which matters were discussed. The court entered a minute order on the same day, but it is not included in the appellate record.

## 2.   *Error*

The record is inadequate to demonstrate that the court either failed to resolve the motion—at any time—or erred in denying the motion:  We lack the motion itself, any ruling on the motion, or a complete inventory of the court's rulings.  Although we are troubled by the court's comments upon its initial review of what Pham filed as her fee request, we will not presume that these preliminary comments informed its ultimate decision on the motion.  Because the paucity of the record prevents us from determining what arguments or evidence were marshaled in support of the motion or on what grounds the motion was denied, our presumption that the court ruled properly is decisive.  (See *Jameson*, *supra*, 5 Cal.5th at p. 609.)

Pham's motion to augment the record, filed only after we heard oral argument and took the appeal under submission, does not remedy this defect.  Pham moved to augment the record with what she now contends are her February 2024 request for order seeking attorney fees and her February 2024 income and expense declaration.  Although augmentation may be requested at any time, a request "made after a reasonable time has expired from receiving the record on appeal, … will be denied absent a strong showing of unusual or unavoidable circumstances giving rise to the delay."  (*People v. Preslie* (1977) 70 Cal.App.3d 486, 492; see also *Russi v. Bank of America Nat. Trust & Savings Assn.* (1945) 69 Cal.App.2d 100, 102 [record augmentation " 'may be denied for inexcusable neglect in preparing the record, for delay in presenting the application, or for other reasons' "]; *Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826, fn. 1.)  Here, Pham has shown no such unusual or unavoidable circumstances that would justify her neglect, though we will direct the clerk of this court to file the reply brief Pham submitted without leave after Kazdagli opposed augmentation.

Pham represents that she realized only after oral argument that she had omitted these filings from the appellate record.  This explanation, however, does not rise to the level of good cause to support her exceptionally late motion:  The factual merit of her

14

section 2030 motion is foundational to her appellate claim of error, and she discussed the fact of the motion in her opening appellate brief. Yet despite citing extensively to the record, she did not purport to cite to the documents she now includes in her request for augmentation. Thus, while Pham may have been unaware of any strategic need to include the motion in the record, she cannot have missed the fact of her own decision not to designate the motion for inclusion in the record.[14] Nor do the documents Pham would have us add to the appellate record now—after the completion of briefing, multiple contested motions, and oral argument—bear any file-stamp that would confirm that these were before the family court when it proceeded to trial. Considering the prejudice that would result from augmenting the record at this stage, the close connection between the documents and the claim of error raised in Pham's opening brief, and the inadequacy of Pham's justification for her delay in notifying this court and Kazdagli of her intent to rely on their contents and not merely the fact of having sought section 2030 fees, we deny Pham's motion to augment the record.

But, even though the record is lacking, it is sufficient to show that the trial court erroneously delayed its resolution of Pham's motion for attorney fees.

Unreasonable delay in ruling on even a meritless section 2030 fee motion is error. (See *Knox*, *supra*, 83 Cal.App.5th at p. 38.) We will not fault the trial judge for the initial April 22 setting, a ministerial task that we assume the judge—much like Pham—did not control. But we can fathom no reasonable ground for delaying the hearing still further to a date that would guarantee that, even if the motion were granted, Pham would fail to realize any benefit until the final day of trial. If the court believed it would be unfair to hear the motion after trial had begun, the delay frustrated the purposes of section 2030— to prevent unfairness flowing from unequal access to counsel and to reduce the demands

---

[14] We have considered the content of the income and expense declaration attached as an exhibit to Pham's trial brief, which was included in the appellate record.

on the litigant and judicial officers imposed by future proceedings.[15]  (See *Knox*, at pp. 27–28.)  Delaying the hearing deprived Pham of her statutory right to a reasonably prompt ruling on her section 2030 motion.  (See *Knox*, at p. 38 [failing to hear motion on first day of trial was error, where hearing motion on first day of trial would have required the trial court to rule on the motion more than a month before the second day of trial].)

### 3. *Prejudice*

To warrant reversal, however, Pham must also demonstrate that the trial court's delay was prejudicial—that there is a reasonable probability that in the absence of the error she would have obtained a more favorable result.  (*Knox*, *supra*, 83 Cal.App.5th at pp. 39–40.)  She has not done so.

Pham appreciably struggled with the burden of self-representation throughout trial.  We will assume that with the benefit of counsel, she could have obtained a more favorable result.  But without any record from which to infer her section 2030 motion was meritorious or would have been made so, Pham has not shown that absent an improper continuance she could have secured representation in time to materially improve the result.

A court in determining a need-based fee award must " 'determine how to apportion the cost of the proceedings equitably between the parties under their relative circumstances.' "  (*In re Marriage of Schleich* (2017) 8 Cal.App.5th 267, 295 (*Schleich*).)  If there is a demonstrable disparity in access to funds to retain counsel and ability to pay, the court shall make an order awarding attorney fees and costs.  (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 111–112.)  Relevant evidence includes "the parties' current incomes, assets, and the abilities, including investment and income-producing properties."  (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1313–1314.)

---

[15] We recognize that the court's comments appearing in our limited record were made without deliberation after the court reviewed the motion during the afternoon break on the first day of trial.

The lack of sufficient record here distinguishes *Knox*.  The *Knox* court was satisfied that even if the request was technically deficient, the denial of a reasonably prompt ruling prejudiced a litigant by depriving them of the opportunity to cure those deficiencies.  (*Knox*, *supra*, 83 Cal.App.5th at p. 39 [noting respondent's contention that appellant's fee request did not comply with Cal. Rules of Court, rule 5.427(b)(2) and its requirement of " 'sufficient information about the attorney's hourly billing rate; the nature of the litigation; the attorney's experience in the particular type of work demanded; the fees and costs incurred or anticipated; and why the requested fees and costs are just, necessary, and reasonable' "].)  Here, nothing suggests that Pham's request was merely technically deficient or that she could have met her burden of proof and persuasion if her request were heard earlier.

We recognize, of course, Pham's claim that her failed investments and unprofitable startup left her in dire financial straits, whereas Kazdagli's salary has only improved his financial position since their marriage.  But we also recognize the trial court's expressed "credibility concerns" about Pham including about her "purport[ed]" lack of "affirmative income" and the absence of "medical evidence in support of her claimed medical hardships."  The court does not appear to have granted Pham's motion for fees; and nothing in the record suggests a reasonable probability that Pham would have cleared that hurdle if only the court had timely ruled.  To be sure, Pham's claims, if credited, would have supported a section 2030 award, given Kazdagli's earnings.  But the court was not required to accept them as true, and Pham has not shown a reasonable probability that it would have done so but for the delay.[16]  (See *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 994, 1003–1005.)

---

[16] As noted above, Pham's February 2024 income and expense declaration is in the record as an attachment to her trial brief.  In the document, Pham claimed negative income, net negative assets, and household expenses exceeding her mother and

17

**B.** *Exclusion of Chien*

The Civil Discovery Act of 1986 governs expert witness discovery and requires reciprocal disclosure on proper demand. (See Code Civ. Proc., §§ 2034.210, 2034.260; *Valencia v. Mendoza* (2024) 103 Cal.App.5th 427, 449.) "[O]n objection of any party who has made a complete and timely compliance with" these disclosure requirements, "the trial court shall exclude … the expert opinion of any witness … offered by any party who has unreasonably failed to" list the witness as required by statute, submit an expert witness declaration, produce reports and writings of expert witnesses as required by statute, or make the expert available for a deposition. (Code Civ. Proc., § 2034.300; see also *Cottini v. Enloe Medical Center* (2014) 226 Cal.App.4th 401, 422–423, 425.) A trial court may grant even a noncompliant party's request to exclude the other party's expert testimony, if the latter party's violation of the exchange requirements is sufficiently egregious. (See *Cottini*, at p. 428.) Where the trial court's ruling is not based on a conclusion of law, " 'we review its ruling excluding or admitting expert testimony for abuse of discretion.' " (*Valencia*, at p. 449.)

The trial court prevented Pham from calling Chien at trial because Pham failed to disclose Chien as an expert witness.[17] Pham has not demonstrated error.[18]

---

stepfather's combined income. Pham claimed her startup had lost over $100,000 in 2022 and over $30,000 in 2023.

[17] The trial court permitted Chien to testify to impeach Dowling's testimony. (See Code Civ. Proc., § 2034.310, subd. (b).)

[18] Pham adds that it was improper for the court to exclude Chien from the courtroom while Pham presented her case because the exclusion deprived Pham of "critical support." The court sequestered Chien during Pham's case-in-chief because Pham intended to call Chien to impeach Kazdagli's expert. After Chien observed some of Pham's testimony and Pham spoke with Chien during a break, Pham argued that Chien was helping her testify because Pham had "a lot of documents" and did not "have a lawyer" or "an accountant" and was "self-representing," so Chien was helping Pham understand "what account was transferred to what." The court renewed its instruction to sequester Chien and described Pham's conduct as a "blatant[]" violation of its order. In

18

Kazdagli moved in limine to exclude Chien's testimony.[19] Counsel stated that Kazdagli served a demand and its own expert disclosure but never received an expert disclosure from Pham.[20] The court granted Kazdagli's motion because Pham did not comply with her disclosure obligation.

Pham has not disputed that Kazdagli served a proper demand, that he met his disclosure requirements, or that she failed to disclose as to Chien. She accordingly has identified no abuse of discretion.

Pham instead argues that the trial court erroneously relied on opposing counsel's "false statement" that he did not "really" know who Chien was until about a month before trial. Pham asserts that this was false because Chien had worked with opposing counsel "for over four months, providing thousands of pages of bank statements, tax returns, and debt records." But counsel's awareness that Chien was assisting in Pham's production of documents is not a meaningful substitute for statutory expert disclosures— of the substance of Chien's anticipated opinion, of Chien's reports and writings, of her qualifications to testify as an expert—or the opportunity to depose her. (See Code Civ. Proc., § 2034.300.) Whether opposing counsel "really knew" who Chien was four months before trial is at best tangential to whether Pham unreasonably failed to disclose her intention to call Chien as an expert witness.

_____

her appellate brief, Pham has not developed her assertion that it was improper to sequester Chien in these circumstances. So we reject this claim of error. (See *Falcone & Fyke*, *supra*, 164 Cal.App.4th at p. 830.)

[19] It is unclear from the record whether Kazdagli filed a written motion. Kazdagli's objection to Chien's testimony was discussed on the first day of trial, before Pham began presenting her case-in-chief.

[20] The demand was served while Pham was represented by counsel, but the disclosure after Pham's attorney had substituted out of the case leaving Pham self-represented.

19

## C.     *Trial Process*

" 'The term "due process of law" asserts a fundamental principle of justice which is not subject to any precise definition but deals essentially with the denial of fundamental fairness, shocking to the universal sense of justice.' [Citation.] ' "The trial of a case should not only be fair in fact, but it should also appear to be fair." [Citations.] A prime corollary of the foregoing rule is that "[a] trial judge should not prejudge the issues but should keep an open mind until all the evidence is presented." ' " (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 290–291 (*Carlsson*).) Pham contends that the trial was unfair. On the limited record before us, we reject the contention.

### 1.     *Additional Background*

Before taking evidence, the court asked the parties to identify the issues that required resolution at trial. Among other issues, Pham identified her claim that certain of Kazdagli's accounts had been funded with separate property and that Kazdagli had moved money to Russia.

The court gave Pham the option of presenting her case first or second. Pham elected to go first.

Pham opened her case by referring to six exhibits in her trial brief and stating that she intended to go through all of them. Pham began by preemptively addressing Kazdagli's claims about her alleged abuse of fiduciary duty concerning the funds that had passed through Fidelity 4019. After Pham addressed that topic, the court asked Pham what other topics she wished to address about "why we should handle the division of property in a certain way." Pham turned to her trial brief, stating that it contained examples of transfers that Kazdagli made in violation of the ATRO to take communal property for his personal use. Pham described a $13,200 ATRO violation and identified, but did not describe, three transfers to Russia. When the trial court asked what remedy she was requesting, Pham returned to her desire for help with the financial difficulties flowing from the loss of her investments. After further discussion of Pham's financial

20

losses, the court asked her "[w]hat else [she] want[ed] to" say. Pham answered that she "just" wanted to say that she was being held responsible for the full income tax bill associated with her temporary investment gains. After Pham discussed the income tax bill, the court directed Pham to call her next witness without further inquiring as to whether Pham had any remaining topics for her direct testimony. The court told her that she would have "another chance to talk a little bit later," but the court wanted to move on. After Pham's only other witness—Pham's mother—gave brief testimony, Pham asked for an opportunity to "go through all the exhibit items." The court said it would "let [her] argue things later" and instructed Kazdagli to begin presenting his case. At the time, topics raised in Pham's trial brief but not addressed in her testimony included her claims that (1) Kazdagli diverted community funds to pay for credit card debt he incurred before marriage; and (2) Kazdagli was required to reimburse Pham for furniture, a wedding ring, wedding expenses, abortion expenses, damage to Pham's car, payments on Kazdagli's car, and other personal belongings.[21]

During Kazdagli's case, Pham frequently interjected to state her view of the evidence.[22] The court consistently instructed Pham to limit herself to asserting legal objections, because she would have an opportunity to respond to the evidence later in the trial. On the second day of trial, the court assured Pham that she would be given an opportunity to respond to Kazdagli's evidence, including with her own additional testimony. The court directed Pham to use the time between the second and third days of trial to prepare to give 30 minutes of "concise [additional] testimony."

---

[21] Pham also had not addressed her request for spousal support, an issue the court addressed separately on the third day of trial.

[22] On the first trial day, with Pham appearing remotely, the court silenced her by muting her microphone during a portion of Dowling's testimony.

On the third day of trial, contrary to its statements on the second day, the court stated that trial of the financial issues was complete and it would not take any more evidence on that subject. But, after Kazdagli requested and was granted an opportunity to conclude his testimony on the financial issues, the court stated that Pham would also be allowed to "reopen some additional items on a brief basis." Our record of the third day of trial is incomplete, so we cannot say from the record before us what evidence Pham was permitted to offer on the third day.

### 2. *Pham's Claims of Error*

Pham contends that the trial process was unfair because the trial court gave Kazdagli's counsel significantly more speaking time than it gave her, did not read her trial brief, did not consider any of her evidentiary exhibits, prevented her from putting on her case, and did not allow her rebuttal regarding Kazdagli's evidentiary exhibits. But we cannot substantiate her claims on the limited record provided.

We cannot say that Pham was deprived a fair opportunity to put on her case.[23] During her direct testimony, the court prompted Pham with open-ended questions inviting her to address other issues, cutting off her testimony only after she gave a response indicating that she was addressing her final topic. While it appears that Pham would have addressed additional topics during her case-in-chief had the court permitted her to resume testifying after her mother, the court indicated after Kazdagli's case that it would allow Pham to briefly "reopen." Because our record of the third day of trial is

_____

[23] This disposes of Pham's claim of unequal speaking time. We recognize that the court imposed a time limit with which Pham disagreed, but that limit was neither unfair nor prejudicial if Pham nevertheless had sufficient time to put on her case. Pham's claim that she was allowed only 73 minutes—while Kazdagli's counsel (11 hours) and Dowling (4.5 hours) exhausted all the remaining time—finds no support in the record. Besides frequent trial management discussions between Pham, Kazdagli's counsel, and the court, Pham presented her own testimony, her mother's testimony, Chien's testimony, and cross-examined Dowling. Pham also interjected during Kazdagli's presentation of evidence.

incomplete, we cannot substantiate any contention that the court failed to do so. Nor can we conclude that Pham was precluded from offering evidence on any given subject. (Cf. *Carlsson*, *supra*, 163 Cal.App.4th at p. 292 [reversible error where court "ended the trial in the middle of a witness's testimony" before the completion of one side's case without giving the parties the opportunity to introduce or propose additional evidence].)

Pham's claim that the court improperly ignored her trial brief is unpersuasive. Pham submitted a trial brief, and the court considered it. Pham apparently filed an unsolicited updated brief, which the court did decline to consider. On the second day of trial, the court solicited additional briefing—subject to a 10-page limit, with no attachments—on what the parties "want out of th[e] judgment." What Pham filed exceeded the page limit, embedded screenshots as evidence, and argued or reargued various issues—including Chien's exclusion. On the third day of trial, the court expressed frustration that Pham's brief began with a request to reconsider Chien's exclusion and noted that Pham had also filed an additional 400 pages of exhibits, which the court had not reviewed. Pham has not developed any legal argument that her right to a fair trial required the court to consider these unsolicited and noncompliant filings. Further, as to Pham's 400 pages of exhibits, Pham does not argue and the record does not reflect that she offered any exhibits for admission. Although Pham attached exhibits to her trial brief, she did not request their admission at trial. (See generally *In re Marriage of Pasco* (2019) 42 Cal.App.5th 585, 591; *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1354–1355.)

## D. *Fidelity 4019 and Kazdagli's Breach of Fiduciary Duty Claim*

Pham challenges the court's ruling that she breached her fiduciary duty by transferring assets from Fidelity 4019 to accounts not shared with Kazdagli and in its award of damages, arguing that she had no applicable duty because the assets were her separate property and that the assets had no value by the time of trial. Pham has not established that these rulings were reversible error.

23

### 1. *The Fiduciary Relationship Between Spouses*

Spouses owe each other "a duty of the highest good faith and fair dealing on each spouse," and "neither [spouse] shall take any unfair advantage of the other." (§ 721, subd. (b).) This fiduciary relationship extends to the management and control of community assets until they have been divided by the parties or a court. (§ 1100, subd. (e).) In a dissolution proceeding, each spouse must fully disclose to the other "all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest and debts for which the community is or may be liable" and must "provide equal access to all information, records, and books that pertain to the value and character of those assets and debts, upon request." (*Ibid.*)

This statutory recognition of the fiduciary relationship includes a private right of action for breach of a spouse's fiduciary duty if the breach "impair[s] … the claimant spouse's present undivided one-half interest in the community estate." (§ 1101, subd. (a); *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1270; *Schleich*, *supra*, 8 Cal.App.5th at p. 277.) Remedies include, but are not limited to, "an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs." (§ 1101, subd. (g).) In determining the value of the asset in making such an award, the court shall use the asset's "highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court." (*Ibid.*; see also *In re Marriage of Kamgar* (2017) 18 Cal.App.5th 136, 149–153 (*Kamgar*).)

### 2. *Pham's Breach of Duty*

The trial court determined that Pham breached her fiduciary duty under section 1100, subdivision (e), by transferring more than $1.2 million out of Fidelity 4019 in June and July 2020 to an investment account to which Kazdagli had no access. (See

24

*Kamgar*, *supra*, 18 Cal.App.5th at p. 150.) The court reasoned that Kazdagli had a community interest proportionate to his contribution, because funds from a commingled account were deposited into the jointly titled account to be jointly invested. The court found that after transferring the funds beyond Kazdagli's reach Pham "essentially lost all of those investments" through aggressive investment strategies without giving Kazdagli either input into her decisions or an opportunity to opt out by withdrawing his share.

As a factual matter, Pham does not dispute that money in which Kazdagli shared an interest was added to Fidelity 4019 during the marriage, that Kazdagli was added to Fidelity 4019 during marriage, or that Pham in June and July 2020 moved assets from Fidelity 4019 to accounts Kazdagli could not access. Nor, as a legal matter, does Pham dispute that each spouse continued to owe the other a fiduciary duty in connection with marital assets at all relevant times.[24] Instead, Pham contends as a matter of law that she owed Kazdagli no fiduciary duty as to Fidelity 4019 because the account was her separate property and the deposit of Kazdagli's separate funds or community property did not transmute the account's separate character. In our independent judgment (see *Kamgar*, *supra*, 18 Cal.App.5th at p. 144), Pham's claim fails, and her transmutation focus is misplaced: Assuming (as the court and Dowling did) that the account was her separate property,[25] Pham still owed Kazdagli a fiduciary duty as to his share of any commingled deposits into that account.

---

[24] To the contrary, Pham contends on appeal that Kazdagli breached his fiduciary duties by withdrawing community funds from joint accounts.

[25] The court's remedy for her breach was limited to that portion of the account value traceable to the money in which Kazdagli had an interest, assuming no transmutation. The court awarded Fidelity 4019 to Pham subject to its allocation of remedies for her breach of fiduciary duty. It did not find that Fidelity 4019 was at all relevant times composed entirely of Pham's separate property. So its ruling was not internally inconsistent.

### 3.    *Remedies*

#### a.    *Valuation of Assets*

The trial court awarded Kazdagli $329,409, which, relying on Dowling's report, the court determined was the value of the assets traceable to Kazdagli's monetary interest in Fidelity 4019 as of July 31, 2020—the date of Pham's second breach.[26]  The court declined to award relief under section 1101, subdivision (h), finding that punitive damages were not appropriate.  The court reasoned that evaluating the account as of July 31 was equitable.

Pham contends that it was "inhuman[e]" to impose a $329,409 award on her—when she was bankrupt, operating a startup that was not generating profit, and dependent on her mother for housing and financial support—in favor of her former husband who was earning $250,000 per year (which she attributes to fraudulently secured immigration status) free of the tax liabilities associated with the temporary success of her investments that drove the damage award.[27]

"We review for abuse of discretion the trial court's decision concerning the appropriate remedy for breach of fiduciary duty."  (*Kamgar*, *supra*, 18 Cal.App.5th at p. 150.)  Under that standard, " '[t]he trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' "  (*In re Marriage of DeSouza* (2020) 54 Cal.App.5th 25, 33.)

The court's decision to base its award on the account value at the date of breach—when the investments traceable to Kazdagli's contribution retained substantial value—

---

[26] The court identified the transfers on both June 2 and July 31 as breaches.

[27] Pham describes the award as a "sanction."  This misunderstands the award, which is to compensate Kazdagli for the detrimental impact on his interest caused by Pham's breach of fiduciary duty.

rather than the date of the award—when the investments had lost nearly all of their value—comports with section 1101, subdivision (g). The statute provides for the award of the "highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court" (§ 1101, subd. (g)) in part to protect the claimant spouse from market fluctuations. (See *Kamgar*, *supra*, 18 Cal.App.5th at pp. 151–152.)

We understand Pham's argument to be that, due to her failed investments and associated financial hardship, it was an abuse of discretion to base damages on any earlier valuation.[28] While we recognize the evidence in the record that this award will add to what is already significant debt, the trial court determined that Pham lost substantial assets as a result of her own investment decisions. Nor can those investment decisions be decoupled from her breach of fiduciary duty. While the burden on Pham is onerous, the alternative she proposes would deny Kazdagli his statutory remedy for Pham's breach of her fiduciary duty. We decline to rule that the court's award was an abuse of discretion.[29]

In addition, Pham contends that Dowling's analysis was flawed because he failed to consider the debt Fidelity 4019 owed on margin loans and said that Pham had withdrawn more money from her investment accounts that she had deposited into them.[30] But in calculating the asset value neither Dowling nor the court concluded that Pham had

[28] Pham does not, for example, contend that the trial court should have calculated two awards, one for the breach in June 2020 and another for the breach in July 2020.

[29] Pham notes that Kazdagli claimed she refused a "walkaway" settlement offer, which in his words would have meant that "[n]o one owed anyone anything." Pham argues that Kazdagli's framing of his settlement offer implicitly conceded that he owed Pham money, so the court's award in Kazdagli's favor was erroneous. We lack any basis to treat Kazdagli's settlement offer as evidence of liability. (See Evid. Code, § 1152, subd. (a).)

[30] In passing, Pham suggests that Dowling should have been excluded because he was unqualified. Pham forfeited this undeveloped argument at trial. (See *People v. Farnam* (2002) 28 Cal.4th 107, 162.)

successfully extracted any value from the investment accounts: The court observed that Pham "essentially lost all of [the] investments," and Dowling denied concluding that Pham profited from any withdrawals because money was also put back in.[31] Nor has Pham supplied record citations to substantiate her assertion that Dowling failed to account for margin loans in fixing the account value.[32] We lack a sufficient record to evaluate Pham's challenge to the court's award, to the extent it is based on her challenge to Dowling's analysis.

### b. *Attorney Fees and Expert Costs*

The court identified two statutory grounds for its award of attorney fees and costs, sections 1101, subdivision (g), and 271. Section 1101, subdivision (g) permits an award of attorney fees and court costs as part of the remedy for a spousal breach of fiduciary duty. Section 271 permits an award of attorney fees and costs as a sanction.

Pham contends that the court erred when it awarded fees and expert costs because it ignored her "financial ruin" in violation of section 271. Further, Pham argues that the court rewarded opposing counsel for pressing a false narrative that she was hiding assets and secretly wealthy.

Under section 271, "the court may base an award of attorney's fees and costs on the extent to which any conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of

---

[31] Pham asserts that the award adopted a false narrative that she was hiding assets. In its discussion of spousal support, the court determined that Pham did not need spousal support in part because of her aggressive investing practices. To the extent this suggests a determination that Pham had undisclosed assets based on her willingness to pursue risky investing practices, that determination had no bearing on this asset valuation.

[32] Dowling testified that he generally considered margin loans in calculating the net value of investment accounts. But Dowling's tracing analysis is not included in the limited record Pham designated.

28

attorney's fees and costs pursuant to [section 271] is in the nature of a sanction. In making an award pursuant to [section 271], the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities. The court shall not impose a sanction pursuant to [section 271] that imposes an unreasonable financial burden on the party against whom the sanction is imposed" but the requesting party "is not required to demonstrate any financial need for the award." (§ 271, subd. (a); see also *In re Marriage of Rangell* (2023) 95 Cal.App.5th 1206, 1219.) Such a sanction is payable "only from the property or income of the party against whom the sanction is imposed, except that the award may be against the sanctioned party's share of the community property." (§ 271, subd. (c).)

The trial court recognized that, in imposing a sanction under section 271, it was required to consider all evidence concerning the parties' incomes, assets, and liabilities and was precluded from imposing a sanction that amounted to an unreasonable financial burden on the sanctioned party. But in awarding attorney fees and expert costs as both a remedy for Pham's breach of fiduciary duty and a sanction under section 271, the court did not discuss the parties' incomes, assets, and liabilities or whether the award would impose an unreasonable financial burden on Pham.[33]

Assuming that the trial court's imposition of attorney fees and expert costs cannot be justified under section 271, Pham's failure to address the court's alternate ground for awarding sanctions under section 1101, subdivision (g) is fatal to her appellate challenge. Section 1101, subdivision (g) identifies attorney's fees and court costs as included remedies for a spousal breach of fiduciary duty. With no challenge to the court's alternative ground for awarding attorney fees and expert costs under this statute, we

---

[33] Earlier in its written order, the trial court discussed the parties' financial circumstances in terminating jurisdiction for spousal support. There, the court found Pham was self-supporting.

cannot say that any error in alternatively imposing the same fees and costs as sanctions under section 271 is prejudicial. (See *Knox*, *supra*, 83 Cal.App.5th at pp. 39–40.)

### E.    *Disposition of Other Property and Pham's Breach of Fiduciary Duty Claim*

Pham contends that the trial court erred in its treatment of certain other assets. Specifically, Pham asserts that: (1) the court misclassified four accounts—Chase 1158, Chase 8175, Interactive Brokers 2725, and Interactive Brokers 8338—as Kazdagli's separate property even though they were funded by community income; (2) the court erroneously rejected Pham's claim for $114,000 in community property, based on Chien's tracing; and (3) the court ignored that Kazdagli breached his fiduciary duty by making $30,000 in unauthorized withdrawals, closing three joint accounts, and draining others of assets; and destroyed her car by pouring sugar in the gas tank.[34] We identify no error on the record presented.

Pham's first argument misstates the record. The court treated Chase 1158, Chase 8175, and two Interactive Brokers accounts as community property, directed that the value at the date of separation be split between Pham and Kazdagli, and directed that the accounts would thereafter belong to husband. We reject Pham's contention that the court erroneously treated these accounts as separate property.

Pham's remaining contentions are to the effect that the court was required to uphold certain of her claims. " '[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' [Citation.] Specifically, we ask 'whether the

---

[34] Pham also mentions the disposition of a second car, a Tesla. The court found that the parties jointly owned the Tesla, awarded Pham half of the community equity— the difference between its present value and debt—and awarded Kazdagli the Tesla with responsibility for the remaining debt. Pham observes that this result does not account for her claim that she contributed $5,000 in separate property toward the down payment. But she does not develop this argument with citation to the record or a comprehensive summary of the source of all funds used for the down payment.

appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 163–164 (*Ajaxo*).) The appellate record does not reflect that Pham submitted at trial sufficient evidence to compel a finding in her favor.

Although Pham attached exhibits to her trial brief, she offered none into evidence. Because Pham did not disclose Chien as a testifying expert, she was unable to introduce Chien's tracing into evidence. And Pham herself supplied only conclusory testimony on the subject.[35] We recognize that Dowling did not trace all of the accounts containing community assets and that Kazdagli elected to rely on evidence of account values at separation rather than at the time of trial. According to Chien, Dowling stopped tracing Chase 8175 in November 2018 on the erroneous assumption that all inflows and outflows from then on would be community property. Pham urges us to construe Dowling's election as intended to conceal what she contends were Kazdagli's later breaches of fiduciary duty.[36] But as a reviewing court, we defer to the trial court's judgment on questions of witness credibility, and our standard of review does not permit us to independently weigh the evidence. The trial court having determined that Pham did not meet her burden of proof, we cannot say that her evidence " ' "le[ft] no room" ' " for that assessment. (*Ajaxo*, *supra*, 48 Cal.App.5th at pp. 163–164.)

---

[35] In the trial court, Pham sought relief for transfers amounting to $24,212, involving three Chase accounts the court characterized as community assets and including one business account. The court declined to credit Pham's claim that any of these alleged transactions were improper on their face. Pham identifies still other transfers in her appellate briefing but does not support her claims of impropriety with evidence admitted at trial.

[36] Pham argues that Dowling stopped tracing Chase 8175 in November 2018 to obscure the fact that Kazdagli had transferred community property in the account to his own separate accounts, thereby breaching his fiduciary duty.

**F.**     *Pham's Claim for Reimbursement for Personal Property*

The court denied Pham's claim for reimbursement for personal property retained by Kazdagli after separation, finding that Pham had the opportunity to recover the property but effectively abandoned it by electing not to collect it. Pham disputes the factual predicates for the court's ruling.

Pham contends that the court relied on "manufactured evidence"—"fabricated" and "staged" e-mails that she maintains were contradicted by "clear evidence" that Kazdagli thwarted her attempts to collect her belongings.[37] But we are unable to discern from Pham's challenge anything more than a request to reweigh evidence that she has not included in the appellate record.[38] Such a request is beyond the scope of our appellate review. (See *Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

**G.**     *Pham's Claim for Spousal Support*

A family court in a dissolution proceeding "may order a party to pay for the support of the other party" in an amount and for a duration "that the court determines is just and reasonable, based on the standard of living established during the marriage." (§ 4330, subd. (a).) In exercising this discretion to award spousal support, the court must consider numerous specified circumstances. (See *ibid*.; § 4320.)

" ' "Once the court [considers section 4320's mandatory guidelines], the ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion. [Citation.] 'Because trial courts have such broad discretion, appellate courts must act with cautious

---

[37] The record citations Pham supplies for this contradictory evidence is nominally to a May 7, 2024 hearing; but the register of actions reflects no hearing on that date. If Pham meant by her record citations the transcript of the May *14*, 2024 hearing, we find no relevant material on the cited pages.

[38] Pham did not designate any trial exhibits for inclusion in the appellate record. And the court's order cites a portion of the transcript from the third day of trial that was omitted from Pham's posttrial filing, and thus is not included in the record before us.

judicial restraint in reviewing these orders.' " ' " (*In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 423–424.)

Here, the court denied Pham's request for spousal support of $5,000 per month for 12 months and instead terminated jurisdiction for spousal support. After addressing each factor, the court explained that it viewed Pham's "aggressive investing" and ability to manage monthly expenses, as well as her degree in computer science, as indicia that Pham had become self-supporting. The court declined to credit what it considered Pham's uncorroborated claims of medical hardship.

Pham contends that the court abused its discretion in denying her spousal support because (1) Pham presented "overwhelming evidence of bankruptcy, $400,000 in IRS debt, $130,000 in credit card debt, and medical crises"; (2) the court ignored evidence that Pham was relying on her mother for support; and (3) the court prevented Pham from introducing evidence of domestic violence. We discern no abuse of discretion.

First, we reject Pham's assertion that the court prevented her from introducing evidence of domestic violence. On the third day of trial, the court began to elicit testimony from the parties on each of the section 4320 factors. On the last page of the partial transcript available to us, the court asked Pham about "any documented evidence of domestic violence?" (§ 4320, subd. (i).) But the transcript Pham supplied ends immediately after Pham says, "It's – I don't – it's verbal violence. [¶] But some of it is – ." Thus, the only record we have on this point does not support Pham's claim that the trial court excluded evidence on this statutory factor; rather, it appears to have been the trial court that prompted Pham to address it.[39] We thus lack any basis to deviate from the presumption in favor of the judgment.

_____

[39] The court did curtail Pham's allegations of abuse during the first day of the trial, when the court's focus was on issues of property characterization, valuation and division. That curtailment does not demonstrate that the court refused to permit her to introduce such evidence at any stage of the trial.

Second, Pham submitted no evidence of bankruptcy proceedings. We understand Pham's reference to "bankruptcy-level financial hardship" in the colloquial sense that her debts substantially exceeded her assets.

Third, we are not persuaded that the court abused its discretion in denying Pham spousal support. After separation, Pham had control of substantial assets. Her financial crisis arose after separation as a result of her post-separation investment decisions, including what the court found to be her wrongful resort to community funds to fund her risk-taking. We recognize that the court's assessment of Pham's ability to support herself reflects doubt about the financial constraints she is facing, doubt rooted in Pham's willingness to pursue a risky investment strategy with assets valued at over $1 million. Given the factual context presented and our deferential standard of review, we decline to rule that Pham's financial circumstances years after separation compelled the court to grant Pham's request for spousal support.

## H. *Pham's New Trial Motion*

"[T]he power of the court to rule on a motion for a new trial … expire[s] … 75 days after the filing of the first notice of intention to move for a new trial" if written notice of entry of judgment has not been given by a party and mailed notice of entry of judgment has not been given by the clerk. (Code Civ. Proc., § 660, subd. (c); see also *id*., § 659, subd. (a)(1) [party may file new trial motion "[a]fter the decision is rendered and before the entry of judgment"].) If the court does not timely rule on the new trial motion, "the effect shall be a denial of the motion without further order of the court." (*Id*., § 660, subd. (c).) The court " 'does not have the jurisdiction to make an order granting a new trial on its own motion,' " and it is not " 'within the power of the litigants to invest the court with jurisdiction to hear and determine the motion for a new trial by consent, waiver, agreement or acquiescence.' " (*Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 336.)

On September 9, 2024, Pham filed what we understand was a motion for a new trial under Code of Civil Procedure section 657, among alternative requests for relief.[40] Although the motion was set for hearing on November 14, 2024, the trial court continued the hearing to January 9, 2025. The court heard argument on the request on January 9 and took the matter under submission. The court denied the request on March 10, 2025, reasoning that: (1) Pham failed to submit a memorandum of points and authorities in support of her requested relief; (2) Pham's prejudgment request for order announcing her intention to move for a new trial did not state whether the request was based on her written affidavit or the minutes of the court or both; and (3) the court's jurisdiction over her request for a new trial expired before the January 9, 2025 hearing because 75 days had passed from the filing of the first notice of intention to move for a new trial.

Pham contends that the trial court erred by denying her new trial motion as untimely after rescheduling the hearing over her objection because opposing counsel falsely claimed not to have received service. Even assuming service was proper, however, Pham's motion was denied by operation of law after 75 days and the court lost jurisdiction to rule on it.[41] The court's determination that it had lost jurisdiction was correct.

Pham's contention that the trial court improperly continued the motion over her objection is unsupported by the record. Correspondence in the record reflects that Pham agreed to a continuance and communicated her agreement to the court via e-mail. The appellate record Pham designated omits the November 14 hearing at which Pham asserts the continuance was granted. To the extent Pham's description of that hearing differs from the court's account in its order denying the new trial motion, we have no record to

---

[40] Pham's moving papers are not in the appellate record.

[41] We cannot say for certain what Pham filed, on our limited record. Nor can we evaluate the court's alternative procedural grounds for denying the motion.

substantiate Pham's version of events. Without a record to demonstrate error, we must presume the court acted properly. (See *Jameson*, *supra*, 5 Cal.5th at p. 609.)

We also reject Pham's assertion that the court's decision to continue the hearing reflects an ex parte communication. The appellate record contains two different e-mail threads, before the scheduled hearing, in which the parties notified the court of their agreement to continue the hearing.[42] First, Pham e-mailed the court reporting that the other party wanted a continuance and that she was "okay with this" pending a ruling on her disqualification motion. It is unclear whether she copied opposing counsel on this e-mail. Second, opposing counsel's office e-mailed the court and Pham reporting the agreement to a continuance. While the court responded stating that this was an improper use of the court's e-mail, these e-mail chains undercut Pham's argument that the court's awareness of the agreement to continue the hearing was derived from an ex parte communication between the court and opposing counsel.

Ultimately, " ' "[i]t is the duty of the party to … see that his motion for new trial is set for hearing within the statutory time." ' " (*Choochagi v. Barracuda Networks, Inc.* (2020) 60 Cal.App.5th 444, 469.) Of course, "any deliberate attempt to deceive or mislead [an opposing party] would be a serious breach of counsel's professional responsibilities and grounds for discipline." (*Palmer v. GTE California, Inc.* (2003) 30 Cal.4th 1265, 1279, fn. 7.) But on this record, we cannot say that counsel made a deliberate attempt to deceive or mislead Pham, as opposed to merely failing to appreciate the timeline applicable to Pham's request for order.

---

[42] The first e-mail on the subject was from Kazdagli's counsel's office, disputing proper service of the request for order and requesting a continuance because opposing counsel was unavailable on the hearing date. Kazdagli's counsel ultimately requested that the hearing set in mid-November be continued to "sometime in the new year" because counsel was "mainly unavailable in December." The 75-day period expired in November after the originally noticed hearing date.

## I.    *Judicial Bias*

A losing party may on appeal raise a nonstatutory claim that a final judgment is constitutionally invalid because of judicial bias.[43]  (*People v. Chatman* (2006) 38 Cal.4th 344, 363; see also *Huang v. Hanks* (2018) 23 Cal.App.5th 179, 183.)  But a " 'mere appearance of bias' " is insufficient to support disqualification on due process grounds; rather, " 'an objective assessment of the circumstances in the particular case' " must reveal " ' " 'the probability of *actual* bias on the part of the judge or decision[]maker [that] is too high to be constitutionally tolerable.' " ' " (*People v. Peoples* (2016) 62 Cal.4th 718, 788, italics added [discussing due process rights of criminal defendants].)  Pham's contentions do not meet this standard.

Pham's primary contention is that the proliferation of adverse rulings reflects bias.  But " 'a trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 731–732; *People v. Buenrostro* (2018) 6 Cal.5th 367, 405–406.)  Nor, as we have discussed, has Pham demonstrated many of her predicate claims of error.

Pham also argues that the court showed actual bias by (1) using Kazdagli's language in an order; (2) referring to her as "wife" but to Kazdagli by name; (3) using a "demeaning and dismissive" tone when addressing her but not Kazdagli; and (4) "continuing the proceedings unmoved" despite Pham's claim she was experiencing a nervous breakdown.  The record does not support Pham's claim of bias.

First, it is not uncommon for courts to borrow language from the parties, or to have parties prepare proposed orders or judgments for courts to sign.  (See, e.g., Cal. Rules of Court, rule 5.125.)  Pham complains that the court's September 9, 2024 ruling

---

[43] Pham's contention that the trial judge improperly struck her motion to disqualify him is not cognizable in this appeal, that action was reviewable only by a timely petition for writ of mandate.  (See Code Civ. Proc., § 170.3, subd. (d).)

adopted Kazdagli's framing that she " 'squandered millions.' " (Italics omitted.) But we are unable to locate that turn of phrase in the ruling. Nor has Pham shown that adopting such a characterization would reflect judicial bias: Pham does not dispute that despite "paper gains" she "lost everything" after she failed to cash out her sizeable investments.[44]

Second, the court announced at the beginning of trial that it would at times refer to Pham as "wife" and Kazdagli as "husband." The court invited the parties to advise if they were "offended by that" so that it could refer to them differently. Neither party did so, and the court frequently used "wife" and "husband" to refer to the parties during trial.

Third, we are unable to gauge the court's tone from the transcript. The record at times reflects the court's frustration with Pham, whom the court found had "blatantly … ignored" its order on the first day of trial and continued to "blatantly violat[e]" further instructions. But we observe that the court made efforts to make the trial process more accessible to Pham, who described herself as "completely unprepared for all these things." We are not persuaded that the frustration reflected on the record gives rise to a probability of actual bias.

Fourth, Pham misstates the record in claiming the court ignored her "nervous breakdown." On the third day of trial, the court told Pham it would give her "a brief opportunity to reopen testimony" but that it first wished Pham to address the marital standard of living. Pham said, "I'm sorry, I'm having a nervous breakdown." The court responded, "Okay. Well, I don't want that. Can you tell me what – tell me about your marriage. What – what kind of lifestyle did you have together." Pham provided responsive testimony, after which the court said, "All right. That's all very helpful and responsive to my question, thank you." The court then continued to elicit testimony from Pham. Nothing in this exchange as transcribed reflects bias or indifference. We have no

---

[44] We understand "squandered" in this context to mean that Pham lost the value of her investments, not that she ultimately profited from those investments and spent the money.

basis to construe it as anything other than an effort to ease Pham past her stated emotional distress by redirecting her focus to relevant testimony.

## J.    *Sanctions*

In her appellate brief, Pham argues that Kazdagli and his counsel should be sanctioned for conduct related to this litigation and the parties' divorce.  These arguments are either distinct from the issues before us or unsupported by the record.

As to counsel, Pham alleges the following misconduct:  (1) counsel abused the discovery process; (2) counsel falsely claimed that Pham had made millions in profits and hidden assets when she had gone bankrupt; (3) counsel initially asserted a claim for half of the value traceable to Fidelity 4019 (assuming transmutation) before ultimately seeking lesser relief assuming no transmutation; (4) counsel concealed Kazdagli's fiduciary breaches; (5) counsel stated that Dowling had " 'traced all relevant bank and brokerage accounts' " (italics omitted) but admitted that Chase 8175 was not traced past November 2018; (6) counsel secured exclusion of Chien by making a false representation about when he " 'really even knew who' " (italics omitted) she was; (7) counsel objected to Pham's introduction of evidence;[45] and (8) counsel introduced fraudulent testimony from Dowling and manufactured evidence.[46]

Counsel's arguments are not improper, accepting Pham's description.  There is nothing inconsistent about the position that Pham made profits, hid the assets, then went bankrupt.  Nor is there inconsistency in the statements regarding the tracing.  And it is not inherently improper to retreat from a more aggressive alternative theory of damages to a

---

[45] Based on her citation, Pham appears to be referring at least in part to a specific episode on the third day of trial for which we have no record.

[46] We have addressed Pham's contentions about the hearing date for the new trial motion above.

more modest theory.  We cannot say that counsel's vague representation about his familiarity with Chien was false.

We lack an adequate record to evaluate Pham's claims about discovery, concealment of wrongdoing by Kazdagli, or the introduction of fraudulent testimony or fabricated evidence.  To the extent Pham complains about counsel's speaking time at trial or objections to evidence, we have rejected her merits contentions above.

As to Kazdagli, Pham alleges the marriage was a coercive and abusive sham from its inception, one that left her physically and emotionally traumatized and financially ruined.[47]  We respect the gravity of Pham's allegations and the acuity of her distress from her subjective experience of the relationship, its end, and its protracted dissolution.  But our review of the judgment and the denial of her new trial motion does not provide a gateway for us to adjudicate these grievances.  Nor has she explained why these allegations advance her claims of error on this record.

### III.   DISPOSITION

The judgment is affirmed.  In the interests of justice, the parties shall bear their own costs on appeal.

---

[47] Above, we have addressed Pham's claim that Kazdagli misappropriated community property, vandalized her car, and stole her belongings.

_____

LIE, J.

WE CONCUR:

_____

GROVER, Acting P. J.

_____

WILSON, J.

*Pham v. Kazdagli*
H053271